MICHIGAN COLLEGE OF MEDICINE v. THOMAS J. CHARLES-
WORTH.

*Contracts—Mutuality—Personal liability.*

1. Courts are not to make contracts between parties but are to enforce
   them.

2. Contracts cannot arise where there is no mutuality; and certainly not
   where one person not only had no intention of binding himself, but
   was not even supposed by the other to be making himself personally
   liable.

3. A tramp was run over by a locomotive in a railway yard. A surgeon
   being summoned to help him, telephoned the railway superintendent
   and asked if he should do so. The superintendent answered, yes.
   Nothing was said about pay, and in fact the superintendent had no
   authority to bind the railway company to pay for surgical aid. *Held*,
   that there was no contract upon which he was personally liable for it.

Error to Wayne. (Chambers, J.) June 18.—Sept. 23.

ASSUMPSIT. Defendant brings error. Reversed.

*Alexis C. Angell* and *Ashley Pond* for appellant. A
promise to pay for medical services to another cannot be
implied from merely calling the physician or assenting to his
acting, even though the patient be a relation: *Buck v. Ami-
don* 4 Daly 132; *Smith v. Watson* 14 Vt. 338; *Boyd v. Sap-
pington* 4 Watts 247; *Williams v. Brickell* 37 Miss. 682;
an agent cannot be personally liable on a promise intended
to bind his principal unless it would actually have done so if
made within the scope of his authority: *Dung v. Parker*
52 N. Y. 494; *Baltzen v. Nicolay* 53 N. Y. 467; see *Hall
v. Lauderdale* 46 N. Y. 75; *Barry v. Pike* 21 La. Ann 221;
*Murray v. Carothers* 1 Metc. 81; *Ware v. Morgan* 67 Ala.
461; *Aspinwall v. Torrance* 1 Lans. 381; *Smout v. Ilbery*
10 M. & W. 1; *McCurdy v. Rogers* 21 Wis. 197; *Weare v.
Gove* 44 N. H. 196; *Fowle v. Kerchner* 87 N. C. 49; *Walker
v. State Bank* 9 N. Y. 587; *N. Y. &c. Co. v. Harbison* 16
Fed. Rep. 688; *Snow v. Hix* 54 Vt. 478; *Newman v. Syl-
vester* 42 Ind. 106; *Delius v. Cawthorn* 2 Dev. (N. C. L.)
90; *Ogden v. Raymond* 22 Conn. 379; *Beattie v. Ld. Ebury*

L. R. 7 Ch. App. 777; *Weeks v. Propert* L. R. 8 C. P. 427; *Walker v. State Bk.* 9 N. Y. 587.

*Trowbridge & Brewster* for appellee. One who asks a physician to attend another is liable for the doctor's services: *Clark v. Meigs* 7 Vt. 76; if an agent so exceeds his authority in the contract made by him that the principal is not bound by it, he becomes himself liable to the person with whom he deals: Story on Agency (9th ed.) § 264; *Jones v. Downman* 4 Q. B. 235; *Mott v. Hicks* 1 Cow. 536; *Bay v. Cook* 2 Zabr. (N. J.) 343, 352; *Gillaspie v. Wesson* 7 Porter 454; see also *Feeter v. Heath* 11 Wend. 479, 485; *Meech v. Smith* 7 Wend. 315, 317; *Layng v. Stewart* 1 Watts & S. 222; *Weare v. Gove* 44 N. H. 196; *Underhill v. Gibson* 2 N. H. 352; *Dusenbury v. Ellis* 3 Johns Cas. 70; 1 Am. Leading Cases 636, notes.

CHAMPLIN, J. The plaintiff is a corporation existing under the laws of Michigan. Dr. Henry F. Lyster is a physician and surgeon residing at Detroit, and is president of the faculty of the Michigan College of Medicine. What his authority is, if any he has, to make contracts binding on plaintiff does not appear from the record before us.

The defendant is superintendent of the Detroit division of the Lake Shore & Michigan Southern Railway Company. On the evening of November 10, 1882, a person not a passenger or employee of the Lake Shore & Michigan Southern Railway Company was run over by an engine in the company's yard, by which his limb was crushed below the knee, and a messenger was sent (by whom is not disclosed) to Dr. Lyster to procure his assistance. The doctor had had some experience with the railroad company before, and there had been some dispute about bills which had been presented by the doctor for similar services; but such matter had been personal with the doctor and not with plaintiff. It appeared that this was the first instance where Dr. Lyster had taken a person injured on this company's road to the hospital connected with the Michigan College of Medicine. When the messenger called upon Dr. Lyster to render assistance to the injured person, he called up the defendant by telephone,

and we quote from the testimony of the doctor as to what occurred :

"I called up Mr. Charlesworth. I knew he was the superintendent, and asked him if he wanted me to go down and attend this man who had been run over. He had not heard of the accident before. It was the first he had heard of the accident. It was late in the evening. It was a winter evening, and the telephone was the most ready method to reach him, and I told him that there had been a man there from the road who had come up for me. An employee said there was a man run over by one of their engines and severely injured. I wanted to know if I should go down and take care of him and attend him. He said, 'Yes.' I said, 'Shall I take him to a hospital,' and he said, 'Yes.' There was some other conversation. I don't remember the details of it exactly; something about the nature of the accident, who the person was, or something. I didn't know anything about it particularly. Nobody did at that time. And under that authority I went down and I telephoned for the ambulance to the hospital of the Michigan College of Medicine. It was the only ready method of conveyance that could be obtained, and the ambulance reported there. I dressed this man and took him to the hospital in the ambulance, and I was obliged to make an amputation that night."

*Question.* When you called the superintendent Mr. Charlesworth, up by telephone, what did you say to him—what was the substance of the conversation ?

*Answer.* I have given you the substance pretty much.

*Q.* Was anything said about pay ?

*A.* I don't think there was anything said about pay. I do not think there was anything said to Mr. Charlesworth about not having received pay for my services rendered formerly at the time when I called him up on the telephone. I don't remember anything now that I said, anything about those previous matters, alluding to them; I do not remember. I have given the conversation as I recollect it, as far as the main points of it, that I had in my mind, which related to getting authority to take him to the hospital. The details I don't remember further. There was something,—as it was the first intimation Mr. Charlesworth had of the injury,— something was said about that, but the details of the conversation I don't recollect beyond that. I think Mr. Charlesworth said something about it would not do to let the man suffer, or something of that kind. I took him to the hospital that

night, and he stayed there until the twenty-ninth of December, from the tenth of November, 1882,—about seven weeks. I performed a surgical operation. He had been run over below the knee. The leg had all been destroyed by the wheels of the engine,—all crushed,—an injury that had severed his leg, and I amputated the leg at the knee joint that night. He was furnished during that time at the hospital with medicines, nursing and board, and all the necessary care was furnished by the hospital,—nursing, medicines, rations, fuel, lights, bedding and everything that is required under those circumstances. He was discharged from the hospital as soon as he could be with safety—as soon as he was well. He got well very quickly. He was kept there a very short time for cases of that sort. He was not kept there only about half as long as cases of that kind are kept in the hospital—case of an injury and operation. The charge was five dollars a week. It was less than a reasonable charge. It was made at a lower rate because it was a railroad company, and a good deal of business comes from railroad companies, so that we make a lower rate. The college presented the bill to the railroad company, and they declined to pay—the company to whom it was referred. Their attorney declined to pay it. The bill was sent to the superintendent by the hospital."

The witness identified a letter written by the superintendent as follows :

"DETROIT, December 22, 1882.

*Dr. Henry F. Lyster, City*—DEAR SIR : In relation to the bill you presented for attendance to D. O'Brien, would say there seems to be some mistake in the matter. You called me up on telephone and asked me about it. I said you had better go and look after him, as it would not do to let him suffer. This I done as an act of humanity, but it seems to me it is presuming a great deal to think that this covers his whole time of disability. It was the farthest thing from my mind. I only wished you to take care of him for the time,—to perhaps save his life. One of the officers of the college came down with a bill for board yesterday, and left word with my clerk that others would follow. It looks as if this was imposing on good nature. I have referred everything to Ashley Pond, our general attorney, who you can consult on the subject.

Very respectfully,

T. J. CHARLESWORTH, Superintendent."

—which was read in evidence, as was also the following letter:

"The Lake Shore & Michigan Southern Railway Co.

Cleveland, O., February 9th, 1883.

My Dear Sir: I have received your letter of the first inst., respecting the bills of Dr. Lyster.

Herewith inclosed I send you copy of circular notice issued by the company in 1878. When this circular was issued it was generally distributed along the line, and we presume all parties interested saw the notice and understood the policy of the company.

Under this policy we must decline to pay the bill to Dr. Lyster.

Very truly yours,        John Newell, Gen'l Manager.
*L. S. Trowbridge, Esq., Detroit, Mich.*

The circular referred to was introduced in evidence as follows:

"The Lake Shore & Michigan Southern Ry. Co.
*To all Officers and Employees.*

Cleveland, December 12, 1878.

Notice is hereby given of a change in the policy of this company towards employees who may be injured in the service.

Hereafter, the provision of surgical aid, nursing, hospital assistance or other needs for injured men must be made by the employees themselves; and this company will not assume any responsibility of any kind in respect of the expenses which may accrue from any accidents which may happen. No allowance for lost time on account of injuries will be made except in special instances, after approval from the general office. Every employee now in, or who may hereafter be employed in the services of the company, can only continue in or enter into the service of the company with the understanding that he assents to and will adhere to this rule.

Charles Paine, General Superintendent.
L. H. Clarke, Chief Engineer."

It was admitted that this circular was sent to defendant, as well as the rest of the employees of the road. Upon cross-examination Dr. Lyster testified as follows:

" When I first saw this man I found him on the floor in one of the rooms down in the yard, very seriously hurt. I understand now that he was not an employee. I took him up to the college, and kept him there until the 29th of December from that night. After I took him to the college I don't think I had a conversation with Mr. Charlesworth with reference to paying his board bill. I don't remember any. I do not think I had any correspondence with him. He wrote me that letter. I will swear very positively to the two main points of what was said through the telephone that night. One was, whether I would get authority to go down and see the man, from Mr. Charlesworth ; and the other was whether I had authority to take him to the hospital. These two points I swear to positively, because that was the reason I called him up. I don't recollect anything said about pay. My recollection is that there was some further conversation about the nature of the injury, etc., but nothing very definite.

*Question.* Now, as your evidence has shown, doctor, at that time you thought you were employed by the Lake Shore Road ?

*Answer.* I don't think I would have selected Mr. Charlesworth out of the whole city of Detroit, although I had some evidence that he was charitable. I would not have selected him out as an individual ; I selected him as superintendent of the road.

*Q.* And you bring your claim against him as an individual, after the road has refused to pay ?

*A.* Yes, sir."

The plaintiff produced Annie McDougall, who was a nurse at the hospital, who gave evidence tending to prove that O'Brien was received at the hospital November 10, 1882, about nine o'clock at night, and received nursing, care and food, and was discharged the 29th of December,—as soon as he was well enough to be discharged without injuring his health.

Upon this testimony the plaintiff rested its case. The defendant's counsel then moved the court to take the case from the jury upon the ground that no evidence had been produced which would bind the defendant. The court refused, but stated he should leave the case with the jury under the following instruction, namely :

" That if the defendant authorized the taking of this man

to that hospital at the request of the Michigan College of
Medicine, being called on as superintendent of the road, by
Dr. Lyster, and having, by that act, led the plaintiff to believe
that he had authority to bind the road to take care of the
patient, and he not having authority, if he exceeded his
authority, that he would be personally liable, and if he had
no authority at all to order it, and if the jury believe that
was an order to keep the man there any length of time, then
he is individually liable."

To which ruling and decision the defendant excepted,
and this constitutes the defendant's first assignment of error.

The suit was commenced in justice's court. The record
states that "the plaintiff declared orally in assumpsit upon
all the common counts, and for professional services rendered,
and claimed damages three hundred dollars or under." The
plea was the general issue, and notice was given of a defense
based upon the statute of frauds. In order to entitle the
plaintiff to recover, it was incumbent upon it to prove that
a contract was entered into, either express or implied,
between the parties, based upon a sufficient consideration.
That there was no express contract is conceded, but plaintiff
contends that an implied contract exists under the facts and
circumstances of the case—*first*, from what was said through
the telephone; and *second*, from the want of authority of
defendant to bind the railroad company. It is quite clear
from the evidence that it was not the intention of Dr. Lyster
that the defendant Charlesworth should be personally bound
by what was said through the telephone, and it is equally
clear that the defendant had no such intention. There was
neither employment nor promise to pay for services to be
rendered, either by plaintiff or Dr. Lyster. Under such
circumstances how can it be possible that there should exist
that mutuality of intention which justice requires as the
foundation for every binding contract? The counsel for
plaintiff asserts that it arises out of the fact that Dr. Lyster
supposed that he was obtaining authority from the Lake
Shore Railroad Company by obtaining the consent of its
superintendent to take charge of the injured person and

take him to a hospital; that the company now repudiates the bill for services, and it turns out that the superintendent had no authority from the company to consent to the employment of Dr. Lyster, and therefore defendant is personally liable.

Let us suppose, then, that. Dr. Lyster intended to treat with the defendant in his individual capacity, and consider whether in that case there would be any liability. A person was injured requiring surgical assistance, nursing, care and attention. He was in no manner related to defendant. The defendant owed him no duty, morally or legally. He was called upon to perform no action other or different than that which appeals to the sympathies of our common humanity for a suffering creature, and in this respect, and toward this injured person, Dr. Lyster and the defendant stood upon an equal footing. The doctor, being informed of the accident, addressed the defendant, and received answers as follows: "I want to know if I shall go down and take care of him and attend him." *Answer*: "Yes." "Shall I take him to a hospital?" "Yes;" and added further, "It will not do to let the man suffer," or something of that kind. Is there sufficient in these circumstances and in this conversation to raise an agreement by implication that defendant would pay the doctor for services by him to be performed, and the hospital for board, nursing, care, etc? Manifestly not. Defendant had no beneficial interest in its performance. There was no duty or obligation resting upon him to employ a surgeon or engage admittance to a hospital. There was nothing in the language employed by the doctor to intimate to defendant that he was engaging his professional services to him. Nothing was said or implied from what was said about pay or recompense, and no promise, express or implied, by defendant, that he would pay or recompense for attendance and taking the injured party to a hospital. To hold that a binding contract existed between these parties would be to create a contract where none was intended, to impose obligations where none were assumed, and that to an extent which was entirely indefinite and unknown to the defendant. It is the province of courts to enforce, not to make, contracts between parties; and when the

parties have failed to make binding engagements, the courts cannot supply, by intendment or inference, those essential elements which are required to constitute a valid agreement. The court below should have instructed the jury that on the plaintiff's own showing there could be no recovery, and directed a verdict for defendant.

The court having refused to direct a verdict for defendant, he introduced testimony which tended to prove that he did not make any contract with plaintiff either in his own behalf or as agent of the railroad company of which he was superintendent. He testified that he was not authorized by the Railroad Company to employ a surgeon on this occasion. He also testified to having received a letter from Dr. Lyster some time before the accident to O'Brien, of which the following is a copy:

"DETROIT, August 21st, 1880.

MY DEAR SIR: On the organization of the new clinical hospital for the reception chiefly of the sick and injured poor, two of the wards have been allotted to me to furnish and equip.

Medical and surgical services will be rendered, without charge to all coming upon the hospital foundation, by the large and experienced medical staff. Personally, I am very greatly interested in the success of the institution.

Very sincerely yours,          HENRY F. LYSTER."

The witness states that this letter had no influence or bearing upon the conversation between himself and Dr. Lyster, as it was not in his mind at the time; that the first he knew of any charge being made to any person for the care and medical attendance of O'Brien was when the bill was presented to the Railroad Company therefor, respecting which he addressed the letter to Dr. Lyster of date December 22, 1882.

Upon the record before us, we do not consider that the defendant was individually liable to the plaintiff in this action. Whether an agent is personally liable, is a question of intention, and not an inference or conclusion drawn by the law (*Heald v. Kenworthy* 10 Exch. 739, 743), except in the sense in which the law deduces intention from language and holds

parties to the legitimate result of their words and actions. 2 Smith's Lead. Cas. 383. We have already commented upon the words and actions relied upon by plaintiff as disclosing a cause of action against the defendant in this case.

We have refrained from passing upon the question raised by counsel for defendant, that in no case where a contract is made with an agent, which cannot be enforced because of the want of authority in the agent to make it, can the action against the agent be upon the contract, because treating the defendant as principal, and the language used as applied personally to him, there exists no contract liability for which he is responsible. *Buck v. Amidon* 4 Daly 132; *Smith v. Watson* 14 Vt. 332; *Crane v. Baudouine* 55 N. Y. 265; *Boyd v. Sappington* 4 Watts 247; *Williams v. Brickell* 37 Miss. 682; *Woods v. Ayres* 39 Mich. 345. The court should have charged the jury, as requested in defendant's first and second requests, to the effect that the defendant never promised to pay the plaintiff for the services and medical attendance and nursing sued for, and their verdict should have been for the defendant.

The judgment must be reversed and a new trial granted.

The other Justices concurred.